UNITED STATES of America, Plaintiff,

v.

Pius AILEMEN, et al., Defendants.

No. CR–94–0003 VRW.

United States District Court,
N.D. California.

March 24, 1995.

Lester Rosen, San Rafael, CA, for defendant Theukwu.

Frank McCabe, San Francisco, CA, for defendant Dele Ailemen.

Stephen Shaiken, San Francisco, CA, for defendant Ofomata.

Mark J. Rochon, Washington, DC, for defendant Tinney.

Michael J. Yamaguchi, U.S. Atty. by Jonathan Howden, Teresa Canepa, Asst. U.S. Attys., San Francisco, CA, for plaintiff.

Gail Shifman, San Francisco, CA, for defendant Pius Ailemen.

Susan Raffanti, Oakland, CA, for defendant Gladney.

Brian Berson, San Francisco, CA, for defendant Onuaguluchi.

REPORT AND RECOMMENDATION RE MOTION BY DEFENDANT AILEMEN TO DISMISS ON GROUNDS OF DOUBLE JEOPARDY *

BRAZIL, United States Magistrate Judge.

## INTRODUCTION

Given the holding by the Court of Appeals for the Ninth Circuit in *United States v. $405,089.23 U.S. Currency* (referred to hereafter as *Arlt*, the surname of the lead defendant), 33 F.3d 1210 (9th Cir.1994), and the findings of fact made in the next section, I need address in depth only two issues to rule on defendant's motion to dismiss based on the Double Jeopardy Clause of the Fifth Amendment. These two issues are: (1) whether defendant's failure to file claims in the forfeiture actions of which he had notice forecloses application of the Double Jeopardy doctrine, and, if not, (2) whether some or all of the offenses with which defendant Pius Ailemen is charged in the Superseding Indictment (filed July 11, 1994) are the same offenses for which punishment was imposed on him through the forfeiture proceedings.

## FINDINGS OF FACT

1. In 1989 a grand jury indicted Pius Ailemen on charges of conspiring to import heroin into the United States, conspiring to possess with intent to distribute heroin, distributing heroin, procuring interstate travel in furtherance of a business enterprise to unlawfully import and distribute heroin, making false statements to the INS, and making false statements in an application for a passport. Superseding Indictment in CR 89–0585 WHO, filed Nov. 30, 1989.

2. On October 5, 1989, federal agents seized $12,012 in currency and one cellular telephone from Pius Ailemen (aka Muhammed Musiliu Popoola). The seizure and subsequent forfeiture action were based on the allegation that the currency and phone had been "used or acquired as a result of a **drug-related offense.**" Exhibits 1 and 2 in

Support of Defendant's Motion to Dismiss, Feb. 7, 1995 (emphasis in original).

3. On October 12, 1989, agents seized an additional $15,000 in currency from Pius Ailemen, again on the ground that this money had been used in or acquired through illegal drug trafficking. *Id.*, Ex. 3.

4. In December of 1989, Pius Ailemen, through counsel, filed formal notices of claims of ownership in the $12,012 and in the $15,000. *Id.*

5. Though the details of the remainder of the forfeiture process in 1989 and 1990 are not clear (e.g., it is not clear whether Pius Ailemen took all the steps necessary to compel the government to file a complaint for forfeiture in the district court, or whether, if such a complaint was filed, whether he formally answered it or presented evidence to try to defeat the forfeiture action), it appears that the property identified in paragraphs 2 and 3, above, eventually was forfeited to the United States. Uncontested averments in defense counsel's Memorandum in Support of Pius Ailemen's Motion to Dismiss, Feb. 7, 1995, at 2.

6. After a trial in 1990, a jury acquitted Pius Ailemen of the drug charges in the superseding indictment, but convicted him of passport fraud. Court file in CR 89–0585 SC, Docket Numbers 96, 108, and 113. See also Ex. 12 in Support of Ailemen's Motion to Dismiss, filed February 7, 1995, and Affidavit of Special Agent Robert J. Silano in Support of Application to Extend Authorization for Wiretap, filed November 10, 1993, at pages 13–14.

7. Despite the 1989–90 prosecution, the government believed that Pius Ailemen's "heroin trafficking organization [remained] intact" and that after he was released from custody he resumed his activities running a major drug trafficking organization. Affidavit of Special Agent Robert J. Silano in Support of Application for authorization to intercept wire communications (a wiretap), filed July 29, 1993, at pp. 8–9. It is not clear how aggressive the monitoring and investigation

---

* Editor's Note: Recommendations accepted by District Judge Vaughn R. Walker on May 9, 1995 except the recommendation on Count 41.

of Ailemen's activities were until the latter part of 1992.

8. By no later than October of 1992 agents of the DEA, working undercover and with the help of a confidential informant, were actively developing evidence of Ailemen's alleged drug trafficking operations. *Id.*, at 9 and 10.

9. On July 29, 1993, the government formally applied for authorization to establish a wiretap for use in this investigation. *Id.* In the Affidavit of Special Agent Robert J. Silano filed in support of the wiretap application the government alleged that it had probable cause to believe that Pius Ailemen and others, including Sidney Gladney and Robert Tinney, "have committed,, are committing, and will continue to commit the following offenses: importing a controlled substance in violation of Title 18, United States Code, Section 545 and Title 21, United States Code, Sections 952 and 960; distributing and possessing with intent to distribute a controlled substance in violation of Title 21, United States Code, Section 841(a)(1); conspiracy to import and conspiracy to distribute controlled substances in violation of Title 21, United States Code, Sections 963 and 846; use of a communication facility to commit or facilitate the commission of the foregoing offenses in violation of Title 21, United States Code, Section 843(b); and violations of Title 18, United States Code, Section 1952, involving travel in interstate or foreign commerce to promote, manage, establish or carry on an unlawful activity, to wit, a narcotics trafficking enterprise." *Id.*, at 3.

The government also claimed in this affidavit that it had probable cause to believe that the conversations to be intercepted would concern the methods and means by which Ailemen and others managed and carried out "their heroin and cocaine operation." *Id.*, at 4. A confidential informant whom the government perceived as reliable provided information beginning as early as October of 1992 that indicated that Ailemen and others were heavily involved "in cocaine and white heroin trafficking organizations". *Id.*, at 9. And an undercover agent allegedly had extensive conversations with Ailemen related to plans to import cocaine from Mexico and to exchange Ailemen's heroin for cocaine from a Columbian source. *Id.*, at 11, 15, 25–27, 29–33, 35, 39, 45.

10. On July 29, 1993, District Judge D. Lowell Jensen signed an order "Authorizing Interception of Wire Communications". CR–93–320 MISC. Based on a series of affidavits from DEA agents and a submission by counsel for the government, Judge Jensen extended this wiretap authorization four times, so DEA agents were permitted to monitor a very large number of Pius Ailemen's conversations over a period running well into December of 1993.

11. On August 30, 1993, Special Agent William de Freitas executed and submitted to Judge Jensen an affidavit in support of a request to extend the wiretap authorization. In that affidavit, Agent de Freitas affirmed his belief that the evidence thus far generated by the government established probable cause to believe that Pius Ailemen and others had been and continued to be involved in, among other things, a "conspiracy to import and conspiracy to distribute controlled substances," "offenses involving the laundering of monetary instruments representing the proceeds of unlawful activity and those involving monetary transactions in criminally derived property, in violation of Title 18, United States Code, Sections 1956 and 1957," and "travel in interstate or foreign commerce to promote, manage, establish, or carry on an unlawful activity, to wit, a narcotics trafficking enterprise, in violation of Title 18, United States Code, Section 1952." de Freitas Affidavit of August 30, 1993, at 7–8.

This affidavit proceeded to set forth evidence that Pius Ailemen and his agents were trying to orchestrate transactions not only in heroin, but also in large quantities of cocaine, were trying to launder proceeds of drug deals, and that Pius Ailemen was the principal manager/leader of an ongoing drug trafficking enterprise that involved at least six other people. See, e.g., pages 12, 20 and 23.

12. During September of 1993 DEA agents monitored many telephone conversations between Pius Ailemen in California and co-defendant Dele Ailemen in London, England. When Dele Ailemen arrived at Los

Angeles International Airport on September 18, 1993 after a flight from England he declared to the U.S. Customs Service that he was bringing $60,000 into the United States. When the funds were counted, they totaled $48,260. These funds were "seized by DEA agents as drug proceeds based upon pertinent conversations intercepted between Pius Ailemen and Dele Ailemen during the wiretap." Affidavit of Special Agent Amie Stanton in Support of Complaint filed December 20, 1993, at p. 48.

13. On October 1, 1993, Special Agent Robert J. Silano executed and presented to Judge Jensen another affidavit in support of another request to extend the wiretap authorization. In this affidavit Agent Silano again swore that the government had probable cause to believe that Pius Ailemen was involved in systematic, large scale drug trafficking operations that involved use of telephones, interstate and international travel, and money laundering. See, e.g., note 1 on page 15, which states: "On September 4, 1993, from approximately 12:00 noon to 6:00 p.m., undercover agents who posed as narcotics traffickers met with Ellis Quarshie. Quarshie told them about Ailemen's method of importing heroin, transporting heroin domestically, purchasing cocaine and transporting it to Europe and Canada, and laundering money domestically and internationally."

This affidavit also portrays Pius Ailemen as the leader of the alleged organization. See, e.g., page 11, where Agent Silano affirms that conversations intercepted under earlier issued orders "show the extent to which Ailemen issues directives to member of his organization." See also page 20, where one of the traffickers alleged states specifically that Pius is his boss. This affidavit further recites considerable evidence that Ailemen was conspiring to traffic not only in heroin but also in cocaine (see, e.g., pages 11, 12, 15–16, 18–20, and 26) and that he was deeply involved in multiple money-laundering maneuvers (see, e.g., pages 21–25, 27–30).

14. Special Agents of the DEA executed additional affidavits to support requests to extend the wiretap authorization on November 8, November 10, and December 9, 1993. In the Extension Application filed on November 9, 1993, Assistant United States Attorney Theresa J. Canepa affirmed that she had discussed the DEA investigation and evidence with the lead Special Agents (Silano and De Freitas), reviewed Agent Silano's Affidavit of November 8, 1993, and concluded, based thereon, that the government had probable cause to believe that Pius Ailemen and others had unlawfully imported a controlled substance, distributed a controlled substance, conspired to import and to distribute controlled substances, used communication facilities to facilitate drug trafficking offense, laundered monetary instruments, and travelled "in interstate or foreign commerce to promote, manage, establish, or carry on … a narcotics trafficking enterprise." Canepa Affidavit of November 8, 1993, at 4–5.

15. On December 14, 1993, after they allegedly heard screams from his room at the Stouffer Mayflower Hotel in Washington, D.C., federal agents determined that Pius Ailemen had been stabbed, apparently by persons sent to perpetrate a "drug rip off" from him. Affidavit of Special Agent Amie Stanton, December 20, 1993, filed in support of the criminal complaints filed that day, at page 69.

16. On December 14, 1993, a search was made, pursuant to a warrant, of Pius Ailemen's room in the Stouffer Mayflower Hotel in Washington, D.C. The government has never suggested that anyone other than Pius Ailemen was registered as an occupant of this room. The search of Ailemen's room yielded, among other things, $1,000 in U.S. currency, which agents of the government promptly seized. Exhibits 4 and 12 to Pius Ailemen's Motion to Dismiss, filed February 7, 1995.

17. On December 15, 1993, federal agents searched Pius Ailemen's apartment at 565 Bellevue Avenue in Oakland, California. In that search the agents found $2,500 in U.S. currency in a suit in the master bedroom and another $2,400 in a suit in the "master closet". Ex. 13 to Pius Ailemen's Motion to Dismiss, February 7, 1995. The agents immediately seized these funds. Ex. 5 to same Motion.

18. On December 20, 1993, the government filed criminal complaints against Pius Ailemen and others, charging them generally with conspiracy to distribute more than one kilogram of heroin (21 U.S.C. sec. 846) over a period beginning no later than October 30, 1992, and extending through December 21, 1993. Cr. Complaint 3–93–786 SL. These complaints were supported by an eighty-two page affidavit by Special Agent Amie Stanton; this primary affidavit incorporated by reference the six affidavits (which ranged in length from 33 to 88 pages) that had been presented during the preceding half-year to District Judge Jensen in support of the wiretap and its extensions. These affidavits contained information that the government believed implicated Pius Ailemen in ongoing, multi-faceted, inter-state and international narcotics distribution activities—including some alleged direct sales of heroin to undercover agents.

19. Pius Ailemen was arrested on the charges reflected in the December 20, 1993 complaint and has been in custody under a detention order for well over a year.

20. On January 3, 1994, the government filed the first indictment in this case (CR 94 0003 VRW). That indictment charged Pius Ailemen with (1) conspiring, over a period beginning no later than April of 1992 and continuing through December 18, 1993, to distribute more than one kilogram of heroin, in violation of 21 U.S.C. sec. 841(a)(1); (2) distributing heroin on December 12, 1992, in violation of that same statutory provision; (3) distributing heroin on February 11, 1993, in violation of the same statute; (4) distributing heroin on August 11, 1993, in violation of the same statute; (5) travelling in interstate commerce on December 13, 1993, with the intent to promote and carry on a business enterprise involving narcotics, in violation of 18 U.S.C. sec. 1952(a)(3); (6) using a telephone (with Sidney Gladney) on August 1, August 26, September 16, September 17, and December 1, 1993, to facilitate trafficking in heroin, in violation of 21 U.S.C. sec. 843(b); (7) using a telephone (with Kingsley Amaechi Ofomata) on August 4, September 3, September 25, October 15, November 10 and December 10, 1993, to facilitate trafficking in heroin, in violation of 21 U.S.C. sec. 843(b); (8) using a telephone (with Nathaniel Theukwu) on August 11, 12 (twice), and 25, 1993, and on October 14, 1993, and on November 18, 19, and 24, 1993, and on December 3 and 10, 1993, to facilitate trafficking in heroin, in violation of 21 U.S.C. sec. 843(b); (9) using a telephone (with Ellis Quarshie) on September 4, October 15, November 20 and November 22, 1993, to facilitate trafficking in heroin, in violation of 21 US.C. sec. 843(b); (10) using a telephone (with Dele Ailemen) on September 7, 8 (twice), 9 (twice), 13, 16, and 17, 1993, to facilitate trafficking in heroin, in violation of 21 U.S.C. sec. 843(b); (11) using a telephone (with Robert Tinney) on September 7, October 8, October 11, October 19, December 6 and December 13, 1993, to facilitate trafficking in heroin, in violation of 21 U.S.C. sec. 843(b); (12) using a telephone (with Victor Onuaguluchi) on October 2 and November 22 (twice), 1993, to facilitate trafficking in heroin, in violation of 21 U.S.C. sec. 843(b); (13) using a telephone (with Keesha Duncan) on October 10 (twice), October 15, and November 24, 1993, to facilitate trafficking in heroin, in violation of 21 U.S.C. sec. 843(b); and (14) using a telephone (with Joycelyn Diane Lane) on November 29 and November 30 (twice), 1993, and on December 3, 1993, to facilitate trafficking in heroin, in violation of 21 U.S.C. sec. 843(b).

As part of the conspiracy count, the government further charged that Pius Ailemen "would and did organize, supervise, manage and arrange for the distribution of heroin by coconspirators" and "would and did oversee, direct and assume responsibility for obtaining quantities of heroin from other coconspirators." January 3, 1994 Indictment, at p. 3. In addition, the government charged that as part of the drug trafficking conspiracy Pius Ailemen and others "would and did possess and transport large sums of cash, derived from the distribution of heroin." *Id.* Further, the indictment charged that it was part of the conspiracy for Pius Ailemen and others to "conduct financial transactions in cash in order to conceal their trafficking in narcotics". *Id.*

21. On January 26, 1994, the government first published notice of its seizure and intent

to forfeit the $1,000 that agents had taken from Pius Ailemen's hotel room in Washington, D.C. on December 14, 1993. Exhibits in Support of Defendant Pius Ailemen's Motion to Dismiss, filed February 7, 1994, Ex. 3.

22. On March 16, 1994, the government addressed a "Notice of Seizure" of the $1,000 to Pius Ailemen c/o the Pleasanton Federal Detention Center in Dublin, CA. *Id.* In that Notice, Ailemen was told, among other things, that he was required to file any claim of ownership "within *twenty (20) days* of the *first date* of publication of the notice of seizure in the edition of the *USA Today* newspaper referenced above." (emphasis in original). Inexplicably, there is no reference in the "Notice of Seizure" to any edition of the "*USA Today* newspaper", or any other newspaper. The Notice does identify the "DATE OF FIRST PUBLICATION", but that date is January 26, 1994—some 47 days before the date this Notice was mailed. Thus it remains something of a mystery as to how Ailemen could have been expected to comply with the requirement of filing a claim within 20 days of the first date of publication. The significance of that impossibility is not clear, however, because in larger type and at a different place on the same Notice the government informs the recipient that he has "20 DAYS FROM RECEIPT OF THIS NOTICE TO FILE A CLAIM WITH THIS OFFICE."

On this same "Notice of Seizure" the government identified only one "OWNER" of the seized $1,000: "Ailemen, Pius". The government also reported on this Notice that this money was "SEIZED FROM: AILEMEN, PIUS." At the hearing on this motion, defense counsel asserted, without contradiction by the government, that the only person to whom the government sent this Notice of Seizure was defendant Pius Ailemen. That fact is of some import, given the statement by the government a few months later in its DECLARATION OF FORFEITURE that "Notice of the seizure has been sent to all known parties who may have a legal or possessory interest in the property." It also is significant that in this DECLARATION the government again stated that it had seized this money from Pius Ailemen

and again identified only him as its owner. This DECLARATION also is in Ex. 4 of the Exhibits in Support of Defendant Pius Ailemen's Motion to Dismiss, filed February 7, 1995.

23. While Pius Ailemen decided, on advice of counsel, not to file a claim to this $1,000 in the administrative proceeding, he now asserts that the $1,000 was his. The only "evidence" to which the government has pointed that tends in any way to cast any doubt on this assertion is a statement attributed to one of the persons who allegedly assaulted Ailemen in his hotel room: when first apprehended, that person (Douglas Fullard) allegedly stated that "the fight [with Ailemen] concerned the 'messing up of my money.'" Affidavit in Support of a Superior Court Search Warrant, executed by David N. Hayes, Detective, December 14, 1993, Ex. 12 of the Exhibits in Support of Defendant Pius Ailemen's Motion to Dismiss, filed Feb. 7, 1995. This "evidence" lends virtually no support to the suggestion that the $1,000 was not Ailemen's. The government's own theory of the altercation in Ailemen's room is that it was a drug "rip-off", meaning an effort by one set of dealers to forcibly take drugs from another dealer. Affidavit of Special Agent Amie Stanton, December 20, 1993, filed in support of the Complaint in this matter, filed the same day. Moreover, there is little reason to believe that Fullard was referring to this relatively small amount of money in Ailemen's room when he spoke of the "messing up of my money." It hardly seems likely that Fullard and his companion would have attempted to murder Mr. Ailemen over $1,000—and then left that money in his room. It is much more likely that if there was any truth at all in the assertion that the assault was about messing with his money, the amount was a lot bigger and had nothing to do with the $1,000 in Ailemen's room. It also is noteworthy that the government never sent a Notice of Seizure to Mr. Fullard—and never identified Mr. Fullard as having any possible claim to those funds.

Given all the circumstances described here, as well as the circumstances in which the money was seized (from a hotel room of which it appears Pius Ailemen was the sole

occupant) (see paragraphs 12 and 13, above), I hereby FIND as a FACT that Pius Ailemen was the owner of the $1,000 here is question.[1]

24. The "Notice of Seizure" formally advised Pius Ailemen that the $1,000 "was seized by Special Agents of the Drug Enforcement Administration (DEA) for forfeiture under Title 21, United States Code (U.S.C.), Section 881, because it was used or acquired as a result of a **drug-related offense.** (See Title 21, Code of Federal Regulations (C.F.R.), Section 1316.91(d) (54 Federal Register 37610–37611) for the definition of the term 'drug-related offense.')" (emphasis in original).

25. The "Notice of Seizure" further advised Pius Ailemen that he had twenty days from March 16, 1994, to file a claim to the property or to file a notice that he wished to contest its forfeiture.

26. Pius Ailemen admits that he received this Notice, but states that he decided, on advice of counsel, not to file a claim or to contest the forfeiture—"in order to preserve his Fifth Amendment right against self-incrimination." Memorandum of Points and Authorities in Support of Defendant Pius Ailemen's Motion to Suppress, Feb. 7, 1995, at 18–19.

27. On May 6, 1994, the DEA issued its "DECLARATION OF FORFEITURE" for the $1,000—stating that the property had been forfeited administratively to the government after no one had presented a claim.

28. On February 7, 1994, the DEA sent a "Notice of Seizure" to Pius Ailemen for the $4,900 that the government took on December 15, 1993, from pockets of two different suits (one in the master bedroom, the other in the master closet) in Pius Ailemen's apartment in Oakland. Ex. 5 of Exhibits in Support of Defendant Pius Ailemen's Motion to Dismiss, filed Feb. 7, 1995. This Notice reported that the person from whom the government had seized the $4,900 was Pius Ailemen, but did not indicate who the owner of this money was. *Id.* The notice contained the same assertion that was in the Notice with respect to the $1,000—that the money was seized "because it was used or acquired as a result of a **drug-related offense.**" (again, emphasis in original). The government sent this notice to Mr. Ailemen in the detention center where it knew he was in custody.

29. In its subsequent DECLARATION OF FORFEITURE the government repeated that the property had been seized from Pius Ailemen and this time identified the owner of the property as "Ailemen, Pius". This DECLARATION also asserted that the government sent notice of the seizure of this money "to all known parties who may have a legal or possessory interest in the property." Also in Ex. 5, *Id.*

30. Just as with the $1,000 discussed above, the government has not contradicted the assertion by defense counsel that the only person to whom the government sent notice of the seizure of this property was Pius Ailemen. Nor has the government

---

1. The government protests that no such finding can fairly be made without a contested hearing in which Ailemen, the government, and any other interested parties present their evidence and argument. I reject this protest on the facts described above—in large measure because, even though it has devoted massive resources to the investigation and development of this case, the government has been able to proffer nothing, except the marginally relevant statement attributed to Mr. Fullard, that might cast any doubt on Mr. Ailemen's claim of ownership. All the circumstantial evidence supports, with considerable force, Mr. Ailemen's claim. Moreover, the government itself identified the money as belonging to Mr. Ailemen in both its Notice of Seizure and in its subsequent Declaration of Forfeiture. That Notice of Seizure identified only Ailemen as the owner—and the government sent the Notice to no other person.

Since the government can point to no meaningful evidence that its conclusion that Ailemen was the owner is not correct, there is no need for an evidentiary hearing to determine who the owner of this property is. A hearing would be useful only if there were a "genuine" issue as to a material fact—but the government has pointed to no evidence from which the court could conclude that there is a "genuine" issue as to the material issue of ownership. In short, the undisputed evidence of ownership in Pius Ailemen is so overwhelming, and the government's failure to proffer any meaningful support for a contrary conclusion is so clear, that having a hearing would contribute nothing to the reliability of the fact finding here.

pointed to any evidence that would support an inference that this money that was taken from Ailemen's pants pockets, in his apartment, was not his. He asserts now that this property was his—and except for the fact that he made no claim to it in the administrative process (a decision he made to protect his rights under the Constitution not to incriminate himself), there is no reason to question this claim to ownership. Given the substantial weight of the circumstantial evidence that supports his claim, and the complete lack of evidence that would tend to contradict it, I hereby FIND as a matter of FACT that Pius Ailemen is the owner of this $4,900.

31. The Notice of Seizure of the $4,900 gave Pius Ailemen twenty days from February 16, 1994, to present a claim. He admits that he received this Notice, but again asserts that, on advice of counsel, in order to preserve his Fifth Amendment right not to incriminate himself, he decided not to file a claim to this money.

32. Having received no claim to the property, the government issued its DECLARATION OF FORFEITURE on April 22, 1994. Ex. 5, *Id.*

33. Given the findings made above, the court need not resolve the more complicated issue of who owned the 1991 Alfa Romeo automobile that government agents seized on December 21, 1993, and apparently later forfeited when no claim was made for it. See Ex. 6, *Id.*

34. On July 11, 1994, the government filed the Superseding Indictment under which this case is now being prosecuted. Pius Ailemen and others, including Sidney Gladney, are charged in Count One of this Indictment with conspiring, from no later than the summer or fall of 1991 until about the middle of December of 1993, to distribute more than one kilogram of a substance containing a detectable amount of heroin and more than one kilogram of a substance containing a detectable amount of cocaine.

Among the 126 Overt Acts allegedly committed in furtherance of the conspiracy in Count One, several involve alleged transactions with *cocaine* that were not alleged in the original (January 3, 1994) Indictment. Most of these alleged acts occurred in the winter and spring of 1992 and involved the sale, packaging, and movement overseas of at least one kilogram of cocaine. Overt Acts 7 through 15, page 5, of the Superseding Indictment. The Overt Acts alleged in the Superseding Indictment also include an allegation that in the fall of 1992 one of the defendant's, at Pius Ailemen's direction, delivered about two kilograms of cocaine to Los Angeles. *Id.*, Overt Act 35 at page 7. This allegation also did not appear in the original Indictment.

35. Count Two of the Superseding Indictment charges Pius Ailemen with engaging in a continuing criminal enterprise between the summer of 1991 and December 18, 1993. This Count sets forth five sets of allegations that allegedly constitute the requisite series of violations in concert with at least five other persons as to whom Pius Ailemen acted as an organizer, supervisor or manager. All of these alleged violations involve heroin—some specific sales, some specific uses of a telephone to promote the sales, and a conspiracy to distribute heroin allegedly beginning no later than the summer of 1991.

36. Counts Three through Twenty-four and Twenty-six through Thirty-eight of the Superseding Indictment re-charge Pius Ailemen (and, sometimes, others) with offenses that also were charged in the original Indictment (distribution of heroin on specific dates, use of the telephone with specified persons on specific dates to facilitate drug trafficking, and travel in interstate commerce to facilitate a drug trafficking business).

37. Count Twenty-five of the Superseding Indictment alleges that Pius Ailemen and Dele Ailemen used a telephone to facilitate drug trafficking on September 13, 1993 at 7:24 p.m. That specific charge does not appear in the original Indictment, which alleged that Pius and Dele Ailemen unlawfully used a telephone on that date, but only once and at 3:58 p.m. That alleged 3:58 p.m. call is re-charged in the Superseding Indictment (as Count Twenty-four), but the call that serves as the basis for Count Twenty-five in the Superseding Indictment is not charged separately in the original Indictment. However,

among the Overt Acts charged in the original Indictment as part of the conspiracy count, the government alleged that Pius and Dele Ailemen engaged in three apparently different telephone conversations on September 13, 1993. Moreover, the Affidavit of Special Agent Amie Stanton (December 20, 1993) that was filed in support of the Complaint that initiated this prosecution specifically describes four different telephone conversations between Pius and Dele Ailemen on September 13, 1993, one of which occurred at 7:24 p.m. and apparently related to the alleged drug trafficking. Thus it appears that the government had sufficient information about the 7:24 phone call to charge it in the original indictment.

38. The Superseding Indictment includes one other charge against Pius Ailemen that was not separately presented in the original Indictment. In Count Forty-one of the Superseding Indictment the government contends that between about September 7 and about September 18, 1993, Pius and Dele Ailemen, along with others not named, conspired to launder monetary instruments in violation of 18 U.S.C. sec. 1956(a)(2)(A). Some of the eight Overt Acts alleged in the Superseding Indictment to have been committed in furtherance of this conspiracy were pled, some with less specificity, in the original Indictment as having been committed in furtherance of the conspiracy to distribute heroin that was charged as Count One of that earlier pleading. Two of the Overt Acts alleged in Count Forty-One do not appear to have been pled in the original Indictment: Overt Act number 4 alleges that Pius Ailemen took possession of $6,000 through an American Express Money Transfer check on September 10, 1993, and Overt Act 7 alleges that Pius Ailemen took receipt of five separate Western Union wire transfers totaling $5,000 on September 9, 1993.

2. The quoted material is from the "Notice of Seizure" used by the DEA in the forfeiture actions against Pius Ailemen. See Ex. 4—Ex. 6 of the Exhibits in Support of Defendant Pius Ailemen's Motion to Dismiss, February 7, 1995.

3. I have chosen to ignore the seizure of the 1991 Alfa Romeo because ownership of it is not clear—and because adding it to the analytical

## RECOMMENDED CONCLUSIONS OF LAW

### IMPLICATIONS OF AILEMEN'S FAILURE TO MAKE A CLAIM IN THE ADMINISTRATIVE FORFEITURE PROCESS

■ The Double Jeopardy Clause of the Fifth Amendment offers protection against both multiple prosecutions and multiple punishments (through separate proceedings) for the same offense. *United States v. Halper,* 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989). After *United States v. $405,089.23 U.S. Currency,* 33 F.3d 1210 (9th Cir.1994) (cited hereafter as *Arlt* ), it is clear that in the Ninth Circuit civil forfeiture proceedings of the kind instituted here and criminal prosecutions constitute "separate" proceedings for purposes of Double Jeopardy analysis—and that a civil forfeiture that causes a person to lose his property "as a result of a **drug-related offense**" [2] imposes "punishment" that can trigger the protections of the Double Jeopardy clause. See *Quinones–Ruiz v. United States,* 864 F.Supp. 983, 986 (S.D.Cal.1994); *United States v. Alejandro Sanchez Cobarruvias,* 94–0732 IEG (S.D.Cal. October 13, 1994); *United States v. Palma–Cheque,* CR 94–0345 GT (S.D.Cal. Jan. 6, 1995); *United States v. Aguilar,* 886 F.Supp. 740 (E.D.Wash.1994); *United States v. Heitzman,* 886 F.Supp. 737 (E.D.Wash. 1994); *United States v. Plunk,* A94–036 CR (JWS) (D.Alaska Nov. 17, 1994).

The first of the difficult issues presented by defendant Pius Ailemen's motion arises because he decided not to file a claim to either the $1,000 that was seized from his hotel room or the $4,900 that was seized from the pockets of his pants in his apartment.[3] The government contends that that failure is fatal to Ailemen's Double Jeopardy chal-

mix would have no affect on the disposition of this motion.

I also ignore in this section the seizures of other property in 1989. As I explain in the next section of the text, the punishment effected through those seizures could not have been for the "same offenses" for which the government wants to try (and punish) Pius Ailemen in this case.

lenge. In support of its position, the government appears to rely primarily on three arguments: (1) by voluntarily deciding not to become a party to the forfeiture action, Ailemen decided not to put himself in jeopardy in that proceeding, and since he was never in jeopardy in that proceeding (jeopardy never attached), it is impossible for the current criminal prosecution to expose him to "double" jeopardy, relying on *United States v. Torres*, 28 F.3d 1463 (7th Cir.1994); (2) by voluntarily deciding not to make a claim in the forfeiture proceeding, Ailemen waived (a) his right to assert later (here) that he was the owner of the seized property, and (b) his right to complain about the loss of the property, and (c) any right under the Double Jeopardy clause that would arise only because of the forfeiture proceeding; and (3) by deciding not to make a claim to the property in the forfeiture proceeding, Ailemen has made it impossible to determine reliably who actually owned the subject property—so its forfeiture cannot be considered punishment of him.

### *TORRES*

Counsel for Ailemen contends that *Torres* is distinguishable in a critical way from the case at bar—pointing out that in that case the Seventh Circuit panel said it had "no reason to believe that [Torres] owned or had any interest in the money. Even in the criminal proceeding, he has not said that he was the funds' owner.... If Torres lacked an interest in the cash, its forfeiture did not impose any penalty on him.... A non-'penalty' imposed in a civil proceeding does not amount to 'jeopardy of life or limb' within the meaning of the fifth amendment." *Id.*, at 1465–66.

As the Findings of Fact, above, show, the case at bar is quite different from *Torres* in this respect. Ailemen does claim in these criminal proceedings that he was the owner of the cash that the government seized and forfeited. More significantly, the court has found, on very persuasive evidence, that Ailemen was in fact the owner of that money. Thus Ailemen, unlike Torres, clearly had an interest in the property—and its forfeiture to the government, "as a result of a **drug-relat**-

ed offense," clearly imposed punishment on him. It follows that to the extent that the holding in *Torres* turned on the fact that the Court of Appeals "had no reason to believe that [the defendant] owned or had any interest in the money," that case has no analytical value in the case at bar.

It is not clear, however, that the outcome in *Torres* turned on this question of fact. In the paragraph preceding the discussion of ownership, the Seventh Circuit panel appears to present a basis for disposing of the double jeopardy claim that does not depend on whether, as a matter of historical fact, defendant had an interest in the seized property. In this earlier paragraph the *Torres* court adopts a formalistic approach, reasoning that because the defendant did not become a party to the civil proceeding, jeopardy never attached there, and that since there was no former jeopardy, there could be no double jeopardy. *Id.*, at 1465.

On closer examination, however, the apparent logical tidiness of this analysis loses its persuasive power. The fact that this reasoning reflects an elevation of form over substance is exposed before the paragraph is completed—in the lines through which the court tries to bolster its argument. Immediately after announcing that "You can't have double jeopardy without a former jeopardy," citing *Serfass v. United States*, 420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975), the *Torres* panel proceeded to declare that

> *[a]s a non-party, Torres was not at risk in the forfeiture proceeding, and '[w]ithout risk of a determination of guilt,* jeopardy does not attach, and neither an appeal nor further prosecution constitutes double jeopardy.' *Id.* at 391–92, 95 S.Ct. at 1064. 'Torres was no more "in jeopardy" in a forfeiture proceeding in which he was not a party than he would have been in a separate trial of [his co-defendant]....' (emphasis added). *Torres* at 1465.

By insisting that Torres was not at risk in the forfeiture proceeding, the Seventh Circuit panel focuses our attention on this question: at risk as to what? At risk of losing property the defendant owned? Or at risk of being adjudged guilty of some wrongdoing?

Is the Double Jeopardy clause concerned with only one of these kinds of risks?

With due respect, it seems to the undersigned that the passage quoted from *Serfass* is taken out of broader doctrinal context—because the Supreme Court has made it clear that the risk against which the Double Jeopardy clause offers protection is not confined to the risk of being adjudged guilty twice of the same offense, but extends also to the risk of being punished twice for the same offense. While one of the abuses against which the Clause offers protection is multiple prosecutions for the same offense, the Clause also, independently, offers protection against a different abuse: multiple punishments (through separate proceedings) for the same offense. To insist, as the *Torres* court appears to insist, that there can be no former jeopardy unless there was a risk that in the first proceeding the defendant could be formally adjudged guilty is to ignore one of the core purposes of the clause, protection against multiple punishments.

■ A court that attends to *all* of the purposes of the Double Jeopardy clause must consider whether, in the first proceeding, the government in fact imposed some "punishment" on the defendant. Given the holding in *Arlt* that the forfeiture statutes are vehicles through which the government can impose "punishment" within the meaning of the Double Jeopardy clause, resolution of the issue of whether jeopardy attached in the first proceeding should not turn solely on the formality of whether the defendant made himself a party to it, but also on whether, through that proceeding, the government in fact used the forfeiture laws to impose on the defendant a punishment.[4]

■ In the case at bar, I already have found, as a matter of fact, that Pius Ailemen owned both the $1,000 and the $4,900 that the government forfeited from him through the administrative process. By taking his money "because it was used or acquired as a result of a **drug-related offense**" the government has imposed a punishment on Pius

Ailemen through a separate proceeding. As a matter of hard historical fact, the government already has punished him. It has taken his money under statutes that *Arlt* deems vehicles for punishment. It would ignore reality completely to insist as a matter of theory that he could not have been punished simply because he declined, out of fear for his Constitutional right not to incriminate himself, to formally appear in the forfeiture proceeding. I strongly suspect that the framers of the Double Jeopardy Clause were much more concerned about the realities of punishment than about the forms of proceedings. I therefore recommend that the District Court in the case at bar decline to follow *Torres* to the extent that it appears to hold that, as a matter of law, a defendant who did not make an appearance in a forfeiture proceeding cannot have a Double Jeopardy claim.

### THE WAIVER THEORY

■ I turn to the waiver arguments, which are not pressed directly by the government, but are relied on in part by some of the district judges whose opinions the government terms "better reasoned" than those cited above. The three opinions cited by the government are: *United States v. Nakamoto,* 876 F.Supp. 235 (D.Hawai'i 1995); *United States v. Walsh,* 873 F.Supp. 334 (D.Ariz. 1994); and *United States v. Kemmish,* 869 F.Supp. 803 (S.D.Cal.1994). In these opinions there is substantial interdependence between the waiver theory and the formalistic analysis of *Torres,* which each of these district courts endorses. This interdependence is well-illustrated by the following passage from *United States v. Kemmish, supra:*

> The defendant, upon receiving notice of seizure and intent to forfeit, was faced with a choice. He could have filed a claim within the announced time frame and sought to contest the forfeiture. He chose not to file a claim. As a result, the $16,660 can be forfeited as unclaimed based solely upon the government's belief that it was

4. In the case at bar the government has argued that nothing was put at issue in the forfeiture proceedings because no claim was filed—and if nothing was at issue, no jeopardy could attach.

This is a brisk alternative casting of the formalistic approach in *Torres*—and I recommend that it be rejected for the reasons set forth in the text.

involved in crime. **But there will have been no adjudication of culpability on the part of the defendant in the administrative proceeding and, therefore, no imposition of punishment.** Any adjudication of personal culpability of the defendant will have been waived by his voluntary choice not to file a claim. It is well established that '[t]he Double Jeopardy Clause, which guards against Government oppression, does not relieve a defendant from the consequences of his voluntary choice.' [citing *United States v. Scott,* 437 U.S. 82, 99, 98 S.Ct. 2187, 2198, 57 L.Ed.2d 65] (1978). (Emphasis added). 869 F.Supp. 803, 805.

I will not repeat here the reasons for which I reject as a non-sequitur the assertion that the forfeiture proceedings cannot result in the imposition of punishment when in those proceedings there is no adjudication of the guilt or innocence of the owner of the property. To the extent (which is considerable) that *Kemmish, Walsh,* and *Nakamoto* rely on the formalistic reasoning of *Torres,* I find these district court opinions unpersuasive. But I also question their persuasive force on another ground, a ground based more directly on their use of waiver theory. These opinions assume that the waivers in these cases are both (1) voluntary and (2) knowing. I question both assumptions.

First, it is not at all clear that Pius Ailemen's decision not to contest the civil forfeiture was in any meaningful sense "voluntary." He has advised the court, through counsel, that even though the property in question was his, and even though he would challenge the assertion that it "was used or acquired as a result of a **drug-related offense,**" he decided not to file a claim and not to contest the forfeiture in order to preserve his Fifth Amendment right not to incriminate himself. In other words, he felt constrained to choose between his right to claim his property and his right not to incriminate himself. A decision made under such constraint is not fairly considered "voluntary." See, e.g., *Lefkowitz v. Cunningham,* 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977); *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); and *Garrity v. State of New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

To be troubled by the dilemma the law created for Pius Ailemen, we need not assume, indeed we may not assume, that he knew that he was guilty of the underlying offenses (or some of them) and that if he offered truthful evidence during the forfeiture proceedings he would have to admit that guilt. Rather, Ailemen (with the assistance of counsel) might simply have understood that there was a substantial risk that the government would try to use any evidence he offered in the forfeiture proceedings against him in the criminal prosecution. Knowing that the consequences of losing in the criminal prosecution were so severe—and so much more severe than the consequences of losing his property—and understanding that he could not know in advance how the government might turn his words or documents against him later, he likely concluded (on advice of counsel) that he simply could not take the risk that his evidentiary offerings in the forfeiture proceeding would increase the likelihood that he would suffer the severe harm of criminal conviction on drug offenses with huge potential penalties. How such a decision can be deemed "voluntary" escapes me.

■ Moreover, I am troubled by the fact that in electing to proceed with the civil forfeiture action before the criminal trial, the government in effect has forced the defendant to give up his property without a hearing. It probably has occurred to some government lawyers that defendants in positions like Mr. Ailemen's will feel the fears he has felt (of having the evidence he presents in the forfeiture proceeding used against him in the much more threatening criminal prosecution) and will respond to those fears by 'deciding' not to contest the forfeitures. The foreseeability of this scenario might tempt some government lawyers to press forward quickly with the forfeiture actions, before the criminal trial, in order to increase the likelihood that the owners of the property will not file claims—and thereby increase the likelihood that the forfeiture action will be successful. But even if no government lawyer has ever succumbed to the temptation to

push the civil forfeiture action forward first in order to take advantage of the property owner's vulnerability in the criminal proceedings, the fact remains that the pendency of the criminal action can give the government a huge advantage in the civil proceeding—effectively forcing the property owner to forsake his claim. Thus, if the government faces no risk at all by proceeding with the civil action first, it acquires, willfully or not, an advantage over the property owner (who may be innocent) that seems fundamentally unfair. That kind of unfairness implicates the Due Process Clause of the Fifth Amendment.

Moreover, there is a clear procedural alternative through which the government can fairly pursue both its conviction and its forfeiture ends without placing the defendant at this considerable disadvantage. The government, as the Court of Appeals has suggested, can bring a criminal prosecution and a forfeiture action based on the same offense in the same proceeding. *Arlt, supra,* at 1222. And in such consolidated proceedings, the criminal case can be tried first—putting the civil forfeiture on hold until the jury decides the issues in the criminal case. By sequencing the proceedings this way, the court eliminates the possibility that the defendant will be required to risk self-incrimination during the criminal trial in his efforts to protect his property rights. After the jury decides the issues in the criminal case, the government can decide whether to proceed, immediately and before the same jury, to the forfeiture action. If there has been a conviction, the outcome of the forfeiture action may be compelled as a matter of law in some cases. But even if there has been an acquittal the government might proceed with the forfeiture action—relying on the less demanding standard of proof that would apply in the civil context. The point is that this procedural option affords the government full opportunity to secure all of its legitimate objectives without unfairly (even if unintentionally) subjecting the defendant to severe disadvantages with respect to the forfeiture proceedings.

Another problem with the waiver theory is that it assumes, without clear support at least in this record, that a defendant who decides not to file a claim in the forfeiture proceedings understands what rights he is giving up by making that decision. We can safely assume, absent some unusual circumstance, that defendants who decide not to make claims in the forfeiture proceedings understand that they may be giving up their ownership rights in the seized property. We cannot assume, however, that a defendant like Pius Ailemen also understood that in deciding not to claim his property he was giving up his right to invoke the Double Jeopardy Clause. At the time Ailemen elected not to file a claim for the currency in issue here, between February and April of 1994, the Court of Appeals for the Ninth Circuit had not issued its opinion in *Arlt.* Before that opinion was published, it was not at all clear that civil forfeiture proceedings of the kind involved in this case could trigger Double Jeopardy Clause rights. And since I am not prepared to find that Ailemen's lawyer should have foreseen the holding in *Arlt,* it seems quite unlikely that, at the time he decided not to file claims to his property, Pius Ailemen understood that by so doing he was forever giving up any right to contend that the criminal prosecution should be barred under the Double Jeopardy Clause.[5] If he could not foresee that by his decision he was giving up his rights under the Double Jeopardy Clause, his decision hardly could have been "knowing." And in this setting, he cannot "waive" his Double Jeopardy right unknowingly.

Because I conclude that Pius Ailemen's decision not to file a claim in the forfeiture proceeding was neither 'voluntary' nor 'knowing' as those terms are used in settings like these, I RECOMMEND that the District Court decline to find that Pius Ailemen

---

**5.** For apparently similarly spirited skepticism about whether a "waiver" could be found in these kinds of circumstances, see footnote 8 of District Judge Thompson's "Order" of January 6, 1995, in *United States v. Gonzalo Palma–Chegue,* CR 94–0345 GT, attached as Ex. 16 to the Reply by Pius Ailemen to the government's Opposition to his Motion to Dismiss, filed March 16, 1995.

waived his rights under the Double Jeopardy Clause.[6]

## WHO OWNED THE PROPERTY AND WHO WAS PUNISHED BY ITS FORFEITURE?

The third argument advanced by the government in support of its contention that an uncontested forfeiture cannot trigger Double Jeopardy rights is that by deciding not to file a claim Ailemen has made it impossible to determine who owned the property—and therefore impossible to determine whether that proceeding resulted in him suffering any punishment. There might be something to this argument in some cases, or with respect to some items of property, but there is nothing to it in the case at bar. For reasons set forth at length above, there is ample evidence to determine, without a forfeiture hearing, that Pius Ailemen is the owner of both the $1,000 that was seized from his hotel room and the $4,900 that was seized from the pockets' of his pants in his apartment. Since we can determine that the property was his, we also can determine that he was punished by its forfeiture.

Finding all of the arguments in favor of the government's position unpersuasive, I hereby RECOMMEND that the District Court hold that the administrative forfeitures of the $1,000 and the $4,900 imposed punishments on Pius Ailemen within the meaning of the Double Jeopardy Clause and that, on the facts of this case, his failure to file claims in those proceedings does not block his access to rights under that Clause. I further REC-OMMEND that the District Court hold that the Double Jeopardy Clause bars the government from prosecuting Pius Ailemen for the "same offenses" that underlay the civil forfeitures of the $1,000 and the $4,900. I turn in the next section to the task of determining what constitutes the "same offenses" in this setting.

## THE SAME OFFENSES

Defense counsel's arguments to the contrary notwithstanding, it is clear that the "test" for determining whether the offenses involved in two separate proceedings are the "same" for purposes of Double Jeopardy Clause analysis is not whether they reflect or arise out of the same conduct (*Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), but whether "each offense contains an element not contained in the other." *United States v. Dixon,* — U.S. —, —, 113 S.Ct. 2849, 2856, 125 L.Ed.2d 556 (1993), relying on *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); and *Arlt, supra,* note 10 at 1220.

Before turning to other matters, I point out that the suggestion by the defense that the forfeitures in *1989* were for the same offenses as Pius Ailemen is now charged is unpersuasive. The 1989 forfeitures were based on drug trafficking offenses that allegedly occurred some two years before the earliest dates of the criminal acts charged in the current indictment. But more significant is the fact that the government already pros-

---

6. In making this recommendation, I decline to endorse the following passage from *United States v. Walsh,* 873 F.Supp. 334 (D.Ariz.1994, Order Denying Reconsideration Jan. 6, 1995): "It does not offend constitutional principles to find that failure to file a claim or to respond to a civil forfeiture proceeding is an effective waiver to a subsequent Double Jeopardy challenge. To hold otherwise, would allow criminal defendants to choose their punishment. A criminal defendant could decide to forfeit material possessions in lieu of going to prison. That is certainly not the intent of Congress or recent Supreme Court decisions." *Id.,* at 337.

The intent of Congress, of course, must yield to *constitutional* norms. But the more troublesome aspect of this passage from *Walsh* is the suggestion that the choice faced by the courts is between finding waiver and permitting defendants to choose their own punishments. This suggestion seems inaccurate for two different reasons. First, few if any defendants have knowingly chosen to forfeit their property as a way of avoiding going to prison—because few if any defendants understood, at the time they were making these decisions, that the forfeiture proceedings had any implications for their rights under the Double Jeopardy Clause. But more significant is the fact that the choice here is entirely within the government's control: simply by deciding to bring the forfeiture action within the criminal prosecution, the government can fully foreclose the possibility that a defendant might have the power to choose his punishment. In other words, if any defendant in the future acquires such power, it will only be because the government decided to give it to him by pressing forward first and separately with the civil forfeiture.

ecuted Ailemen, through a separate trial long since completed, for those offenses. It hardly seems arguable that the completion of one prosecution for alleged drug offenses affords the defendant a free pass to begin thereafter engaging in new illegal drug deals. Defense counsel has not suggested, wisely, that that earlier trial precludes the present prosecution—and if that trial does not trigger the Double Jeopardy Clause in the present case, it is difficult to understand how an antecedent civil forfeiture could.

The forfeitures in the first half of *1994* of Mr. Ailemen's cash, however, clearly have serious Double Jeopardy implications for the current prosecution. Those forfeitures were based on the extensive investigations of drug trafficking that apparently began in earnest in 1992 and that have continued into the present, investigations that included considerable undercover work, help from confidential informants, and the four and one-half months of wiretaps that preceded the arrests of Ailemen and his co-defendants at the end of 1993. Given the timing of the seizures of the $1,000 and the $4,900, the circumstances in which those seizures occurred, and the justification offered by the government for the forfeiture of these funds (they were forfeited because the government alleged they had been "used or acquired as a result of a **drug-related offense**" [7]), it is clear that the bases for the forfeitures are intimately connected with the bases for the current prosecution. It is against this backdrop that we turn to the more specific issues of the "same offense" analysis.

The *Arlt* opinion already has rejected the most sweeping arguments advanced by the

government in support of its position that the forfeitures and the criminal prosecution cannot be for the same offenses. The government seems to believe that it is proper for this court to re-consider the wisdom of the fundamental underpinnings of the Court of Appeals' decision in *Arlt*. That, of course, this court cannot do. This court is bound by the law that the Court of Appeals for the Ninth Circuit announces.

In *Arlt*, the Court of Appeals squarely and unequivocally held that the Double Jeopardy Clause bars a civil forfeiture action that is based on the same offenses that were prosecuted in a separate criminal proceeding. The Court went on to announce that, by constitutional mandate, "a criminal prosecution and a forfeiture action based on the same offense must now be brought in the same proceeding"—and that if the government elected instead to "pursue the civil forfeiture action" separately, the government would "thus forego the opportunity to prosecute the claimants criminally". *Id.*, 33 F.3d 1210, 1222. These announcements of law by the Court of Appeals preclude this court from considering much of the argument advanced by the government in its opposition to defendants' motions, e.g., the arguments based on statutory authorization to prosecute a defendant under two different sections of the criminal codes for the same conduct or for both a predicate act and a broader offense like a conspiracy or a continuing criminal enterprise. See Consolidated Response to Defendant Gladney's and Defendant Ailemen's Motion to Dismiss the Indictment (Double Jeopardy), filed March 10, 1995, at 6–9.[8]

---

**7.** Notice of Seizure of the $4,900, Ex. 5 of the Exhibits in Support of Defendant Pius Ailemen's Motion to Dismiss, February 7, 1995 (emphasis in original).

**8.** I am particularly non-plused by the government's bald contention that "the *Dixon* and *Garrett* rules permit separate criminal prosecutions and civil forfeitures even where precisely the same statutory violations and criminal conduct are involved in both actions. This is because the 'offenses' for which punishment is imposed in a civil forfeiture case is [sic] *never* the same as the 'offense' for which criminal punishment is imposed under the *Blockburger* test. In a criminal case, the government need only prove that the

defendant committed a crime. In a forfeiture case, however, the government must also show that the property was used to facilitate the criminal offense, or that it was the proceeds of the offense." Consolidated Response, at 7–8. This sweeping contention is fundamentally at odds with the Ninth Circuit's holding in *Arlt*. While other courts, outside this Circuit, might be receptive to arguments like these, it is questionable lawyering for counsel for the government to present such arguments without even intimating that they might not be consistent with the controlling legal authority in this jurisdiction.

My concern about the forthrightness of the government's advocacy on this issue is compounded by the Court of Appeals' opinion in

▪ I also feel constrained to point out that the government's efforts to defeat a motion based on a *constitutional* mandate by arguing about what *Congress* intended to authorize, as a matter of statutory construction, is fundamentally misplaced. The government seems to have forgotten that in cases of conflict, the Constitution always trumps statutes (regardless of the Congressional intent the statutes reflect). Even the clearest Congressional authorizations of multiple or separate prosecutions cannot survive if they offend the Double Jeopardy Clause.

▪ I turn now to an examination of the real issues here: whether the punishment imposed on Pius Ailemen in the forfeiture proceedings was for the same offenses with which he is charged in this criminal prosecution. The fact that the forfeitures were effected by default complicates the process of answering this question. If there had been a contested hearing in the forfeiture proceedings, followed by an opinion from the court, we might well be able to identify with more confidence the specific "offenses" on which the government predicated the confiscation of Pius Ailemen's property.

The government has argued that this clouding of the question of which offenses supported the forfeiture is Ailemen's fault. At oral argument, the government suggested that it is only because Ailemen freely chose not to contest the forfeiture that we are deprived of the knowledge that is necessary to resolve this issue. The government further suggests that Ailemen must suffer the consequences of his own decision—and that those consequences include effective loss of any protections from the Double Jeopardy Clause because Ailemen cannot show precisely which "offenses" supported the forfeitures.

The principal difficulty with this argument is that it builds from an erroneous premise: as discussed at some length above, it is a complete figment of jurisprudential imagination to suggest that Pius Ailemen "voluntarily" decided not to contest the forfeitures in issue here. He was effectively coerced into that decision—so it would be quite unfair to visit upon him the loss of his Double Jeopardy rights as a consequence of that decision.

▪ How shall we determine what the offenses were for which punishment was imposed through the forfeiture proceedings? And if we cannot be sure what the answer to that question is, must it be the government's criminal prosecution that suffers? [9]

*United States v. One 1978 Piper Cherokee Aircraft,* 37 F.3d 489, 495 (9th Cir.1994), where the panel stated that "[b]ecause [21 U.S.C. sec. 881(a)(4) and (a)(7) ] incorporate the elements of criminal offenses, forfeitures pursuant to them constitute a species of greater offenses with respect to the lesser-included offenses that form the bases of the forfeitures." The panel proceeded to declare that the forfeiture action in that case would be barred by the Double Jeopardy Clause unless it could be predicated on some criminal act for which the defendant had not already been prosecuted.

The Honorable D. Lowell Jensen of this District ruled in February of this year that *Arlt* and *One 1978 Piper Cherokee Aircraft* compel rejection of the same argument pressed here by the government, i.e., that the forfeiture action and the criminal prosecution cannot be for the same offense because in the one the government must connect the property with a crime while in the other there is no such requirement. See Judge Jensen's Order in *United States v. Wilson,* CR 93–0381 DLJ (February 6, 1995). It also is worth noting that another District Court in the Ninth Circuit has rejected what appears to have been a somewhat less broadly cast version of the same governmental argument. See *Oakes v. United States,* 872 F.Supp. 817, 823–824 (E.D.Wash. 1994).

9. While apparently not implicated by the facts in the case at bar, we pause to point out a problem scenario that could arise in the future in cases like this—where the government believes it has probable cause to prosecute a defendant on many different but closely related counts. In that situation, serious due process questions might arise if the government decided to press forward with a forfeiture action before a criminal trial—but insisted that the forfeiture proceeding was based on only one of ten counts that are closely related in real world events and in evidence. By purporting to base the forfeiture action on only one count, the government might argue that it should risk the loss (on grounds of Double Jeopardy) of only that count—while retaining the right to prosecute the defendant property owner on all remaining nine counts. Even a defendant who stood to lose a great deal of money in the forfeiture action (much more than is in issue in the case at bar) might well feel coerced (out of fear of self-incrimination) into filing no claim for the property—especially if the evidence that he would need to offer to try to defeat the forfeiture related to matters that would be in issue in the subsequent criminal prosecution. In scenarios like this, the government

We begin our effort to answer these questions by considering what the Notices of Seizure communicated to Pius Ailemen (and the rest of the world) about this matter. The Notice of Seizure was identical in this respect for both the $1,000 and the $4,900. In each instance, the Notice offered only the following information: the property was seized "for forfeiture under Title 21, United States Code (U.S.C.), Section 881, because it was used [in] or acquired as a result of a **drug-related offense.** (See Title 21, Code of Federal Regulations (C.F.R.), Section 1316.91(d) (54 Federal Register 37610–37611) for the definition of the term 'drug-related offense.')" Exhibits 4 and 5 to Exhibits In Support of Defendant Pius Ailemen's Motion to Dismiss, February 7, 1995.

Each of the crimes with which Pius Ailemen has been charged in the original and Superseding Indictments in this case is a "proscribed offense which involves ... [a] substance the possession of which is prohibited by Title 21, U.S.C." Quoting Title 21, C.F.R. sec. 1316.91(d). For example, the counts sounding in money laundering, aiding and abetting, interstate transportation in aid of racketeering, conspiracy, and a continuing criminal enterprise all are predicated on alleged illegal trafficking in heroin and/or cocaine. There is no non-drug related offense on which any of these charges turn. Nor do any of the documents supporting the prosecution (affidavits) contain evidence sufficient to establish probable cause for prosecutions not related to drug trafficking. It follows that the Notices of Seizure provide no basis for concluding that the punishment effected by the forfeitures was not based on the same offenses for which Pius Ailemen is now charged.

 Our search for other bases for identifying the offenses for which Ailemen was punished through the forfeiture proceedings has lead us to the carefully crafted "Order From Chambers" of District Judge John W. Sedwick in *United States v. Gerald Frank Plunk*, A94–036 CR (JWS) (D. Alaska November 17, 1994), a case, like ours, that

involved both an uncontested administrative forfeiture and two indictments. In that Order, Judge Sedwick decided that to determine which offenses underlay the forfeiture proceedings the court should focus on the date of the seizure (rather than the date of the Notice of Seizure or the date of the Declaration of Forfeiture—an issue to which I return below) and should consider all the information and evidence then available to the government in order to identify the offenses as to which the government believed it had probable cause to prosecute the defendant. Judge Sedwick first compared the indictment that was on file at the time of the seizures to the indictment that was filed after the forfeitures were completed. He dismissed each offense that he found in both indictments. But he did not limit his analysis to these formal pleadings. If the superseding indictment in his case contained a charge that was not in the original indictment, he pushed on to examine the affidavits that preceded the first indictment—in order to identify each offense for which the government believed it had probable cause at the time of the seizures. While I disagree, for reasons set forth below, with Judge Sedwick's view that the appropriate point of reference is the date of the initial physical seizures, I share his view that courts should not be limited to the formal pleadings when they identify the offenses for which the government believed it had probable cause to support the forfeitures.

During oral argument on the instant motion, the court asked counsel for the government to identify the documents and information on which the government based its decision to proceed with the forfeitures that are in issue here. Counsel responded by saying that in a case like this it is his understanding that all the information that is developed in the field and in the local prosecutors' offices is sent back to the offices of the DEA in Washington, where a DEA attorney then makes a determination, based on all that information, whether to proceed with the forfeiture action. The documentation would in-

---

might be tempted to try to artificially limit the probable cause basis for the forfeiture in order to give up just one charge in return for gaining

uncontested access to a large amount of the defendant's property.

clude, perhaps among other things, the affidavits submitted in support of searches and wiretaps, the affidavits submitted in support of the complaint, the complaint, and any indictment that had been returned. Since these are the bases on which the DEA apparently would decide whether or not to proceed with the forfeiture action, it seems appropriate to consider all this information to identify the offenses for which the forfeitures imposed punishment.

It also seems appropriate, in identifying the offenses for which the forfeitures imposed punishment, to focus on the juncture at which the DEA attorney made the decision to proceed with the forfeiture actions, rather than the earlier dates [10] on which the seizures were made by the agents in the field. This follows in part because it appears, from the government's proffer at the hearing, that the authority to decide whether to proceed with the forfeiture actions is vested in counsel to the DEA in Washington, not in field agents. We infer that the DEA lawyer could decide, after reviewing the evidence sent in from the field, that probable cause to support a forfeiture does not exist. We also infer that such a determination would mean both that no "proceeding" would commence and that the property would be returned to the owner. Moreover, the punishment that triggers potential Double Jeopardy rights is not the initial seizure, but the forfeiture, or, perhaps, the formal launching of the proceedings through which the property can be taken.[11]

In the case at bar we do not know the exact date that counsel for the DEA made the decision authorizing the forfeiture proceedings to go forward, but we do know when the "Notices of Seizure" were issued and when the "First Publications" of the intent to forfeit were made. We infer that counsel for the DEA authorized the prosecution of the forfeiture actions shortly before the "Date of First Publication" or the date of the "Notice of Seizure," whichever was earlier. We will use these dates as the vantage points from which to identify the offenses with respect to which the government believed it had probable cause to charge Pius Ailemen in the forfeiture actions.

The earlier of these two dates for the $1,000 is January 26, 1994 (Date of First Publication); for the $4,900, the earlier of the two dates is February 7, 1994. Because we have no reason to believe that the government developed any significant, new evidence against Pius Ailemen between January 26 and February 7 of 1994, we can use either date for current purposes. Moreover, the six wiretap affidavits, the original complaint and the separate affidavit that supported it, and the original Indictment all had been filed before the earlier of these dates. Thus we can look to all these sources to identify the offenses for which the government believed it had probable cause at the time it launched the forfeiture action.

Turning first to the original Indictment in this action, filed January 3, 1994, we find that it charges Pius Ailemen with several of the same offenses that are charged in the Superseding Indictment, which was filed on July 11, 1994, after the forfeiture actions had been completed. Count Two of the original Indictment and Count Three of the Su-

---

**10.** In the case at bar the physical seizures preceded the filing of the charging documents and, apparently, the decision to proceed formally with the forfeiture action. In some other cases the decision to proceed formally with the forfeiture action might well precede the physical seizures.

**11.** District Judge Gonzales has written thoughtfully about how to identify the juncture at which "jeopardy" "attaches" in at least roughly analogous uncontested, administrative forfeiture proceedings in her Order Denying Defendants' Motion to Dismiss in *United States v. Sanches-Cobarruvias*, 94–0732–EIG (S.Dist.Cal. October 13, 1994), at 6–10 (Ex. 15 to the Exhibits Filed in Support of Defendant Pius Ailemen's Reply to the Government's Consolidated Response, March

15, 1995. The issue with which we wrestle in the text, above, however, is a bit different: we are not concerned with whether jeopardy has attached in a second proceeding, but with how and when to identify the offenses for which punishment was imposed in the first proceeding. For that purpose, at least in the procedural circumstances reflected in the case at bar (uncontested earlier administrative forfeiture), we think the focus should be on the time at which the decision was made to proceed with the formal forfeiture action, rather than either the date of the initial physical seizure or the date the forfeiture is completed administratively (in our case when the Declaration of Forfeiture is issued).

perseding Indictment charge Pius Ailemen with distributing heroin on December 12, 1992, in violation of 21 U.S.C. sec. 841(a)(1). Because the elements of these offenses are identical, I RECOMMEND that the District Court dismiss with prejudice Count Three of the Superseding Indictment on the ground that prosecuting Pius Ailemen on this charge would violate the Double Jeopardy Clause of the Fifth Amendment.

On the same ground, I also RECOMMEND that the District Court dismiss with prejudice as to defendant Pius Ailemen[12] Counts Four, Five, and Six of the Superseding Indictment. Count Three of the original Indictment and Count Four of the Superseding Indictment charge Pius Ailemen with distributing heroin on February 11, 1993, in violation of 21 U.S.C. sec. 841(a)(1). Count Four of the original Indictment and Count Five of the Superseding Indictment charge Pius Ailemen with distributing heroin on August 11, 1993, in violation of 21 U.S.C. sec. 841(a)(1). Count Five of the original Indictment and Count Six of the Superseding Indictment charge Pius Ailemen with traveling in interstate commerce on December 13, 1993, with the intent to promote and carry on an unlawful business enterprise involving narcotics, in violation of 18 U.S.C. sec. 1952(a)(3).

The government also charged Pius Ailemen identically (same date, same time, same person on the other end of the line) in the original and Superseding Indictments on many counts of alleged use of a telephone to facilitate unlawful trafficking in narcotics, in violation of 21 U.S.C. sec. 843(b). I thus further RECOMMEND that the District Court dismiss with prejudice the following telephone counts against Pius Ailemen[13] in the Superseding Indictment: Counts 7–24,[14] and 26–38.

I also RECOMMEND that the District Court dismiss as to defendant Pius Ailemen Count 25—but this recommendation has a slightly different basis. In Count 25 the government charges that on September 13, 1993, at 7:24 p.m., Pius and Dele Ailemen used a telephone to facilitate unlawful trafficking in narcotics. There is no separate count in the original indictment based on this specific phone conversation. It is clear from other documents, however, that at the time the government decided to proceed with the forfeiture action it believed it had probable cause to charge Pius Ailemen on this specific phone call.

In Count One of the original Indictment the government charged Pius and Dele Ailemen, along with other defendants, with conspiracy to distribute heroin. Among the many overt acts identified by the government in that first count as having been committed in furtherance of the alleged conspiracy were three apparently separate telephone calls between Pius and Dele Ailemen on September 13, 1993—but in the recitation of overt acts the government did not specify the time that any one of these calls occurred. Only one of these calls surfaced as the predicate for a separate charge in the original Indictment (3:58 p.m.—Count 36), but in the Superseding Indictment there are charges based on two such calls (3:58 p.m. and 7:24 p.m.).

More significant (because clearer) is the fact that the 7:24 p.m. call is described specifically on page 47 of the affidavit of Special Agent Amie Stanton, filed December 20, 1993, submitted by the government in support of issuance of the Complaint in this case. The same conversation also is described (with some interpretive gloss) at pages 33–34

**12.** Count Five also charges Victor Onuaguluchi; my recommendation to dismiss this count as to Pius Ailemen obviously does not reach Mr. Onuaguluchi.

**13.** The Recommendations set forth in this paragraph reach only defendant Pius Ailemen; additional recommendations, in a separate Report, will be forthcoming as to defendant Sidney Gladney. No recommendation is made here with respect to the charges made against the other defendants named in these telephone counts.

**14.** I infer that Count Nineteen of the original Indictment and Count 17 of the Superseding Indictment are based on the same telephone call (between Pius Ailemen and Nathaniel Iheukwu on August 12, 1993), even though the time of the call is specified as 1:53 p.m. in the first Indictment and 1:55 p.m. in the Superseding Indictment.

of the affidavit of Special Agent Robert J. Silano, filed October 1, 1993, in support of the government's request for an extension of the wiretap authorization that had captured, among many other things, the September 13, 1993, conversations between Pius and Dele Ailemen. The descriptions of the 7:24 conversation in these affidavits, especially in the context of the other evidence the government had developed, shows that even before the Complaint was filed in this action the government believed that it had probable cause to charge Pius Ailemen under 21 U.S.C. sec. 843(b) for this specific use of the telephone.

We turn next to the Count One of the Superseding Indictment, in which the government charges Pius Ailemen (and others) with conspiring, between "no later than Summer or Fall, 1991" and December of 1993, to distribute more than one kilogram of a substance containing heroin and more than one kilogram of a substance containing cocaine, in violation of 21 U.S.C. sections 846 and 841(a)(1). Count One of the original Indictment was more narrowly cast. While it charged Pius Ailemen (and many of the same defendants charged in Count One of the Superseding Indictment) under the same statutes, 21 U.S.C. sections 846 and 841(a), it did not allege as early a date for the apparent commencement of the conspiracy, and the only object of the conspiracy formally charged was distribution of heroin (rather than distribution of both heroin and cocaine).

It is not clear whether these differences in the 'specifics' of the distribution conspiracy charges would lead, under the *Dixon–Blockburger* test, to a conclusion that the elements of the offenses charged in the two Indictments are different. Of the two differences, the difference in the allegations about the date of the commencement of the conspiracy seems quite unlikely to have any significance under the same elements test. This follows in part because of the nature of the allegations themselves. In each instance, the government does not purport to identify the date the alleged conspiracy actually commenced. Rather, in each instance the government merely alleges that "[b]eginning at a time unknown to the Grand Jury, but no later than"—April 1992 in the first Indictment and

"Summer or Fall, 1991" in the Superseding version.

Moreover, a direct application of the "same elements" test seems to preclude a finding that the arguable difference in the time periods covered by the two charges could mean that the two offenses are not the same for purposes of the Double Jeopardy analysis. This follows in part because we are to focus on elements, not conduct, and in part because the first alleged period falls fully within the second charged period—so if the government proved that the conspiracy existed over the period alleged in the second Indictment, the government necessarily would have proved that the conspiracy existed over the period alleged in the first indictment. In this critical sense, there is no time element in the first charge that is not also included in the second charge. Since the first charge, with respect to the time element, is fully subsumed within proof of the second charge, we cannot say, based on the possible differences in temporal reach, that "each offense contains an element not contained in the other." *Dixon, supra*, at ——, 113 S.Ct. at 2856.

The fact that the government alleged in Count One of the first Indictment that the object of the conspiracy was to distribute heroin, but alleged in Count One of the Superseding Indictment that the object of the conspiracy was to distribute both heroin and cocaine, requires separate but not analytically dissimilar treatment. The *Blockburger* test apparently would not be met if the trafficking conspiracy count in the Superseding Indictment had alleged only that the object of the conspiracy was to distribute cocaine—because then proof of the conspiracy to distribute cocaine would not necessarily entail proof of conspiracy to distribute heroin (and vice versa). Thus, proof of each count would have required proof of an element or fact for which proof would not have been required by the other. But in our case the government charged Ailemen in Count One of the Superseding Indictment not just with conspiracy to distribute cocaine, but also with conspiracy to distribute heroin. If the government proved all the elements in Count One of the Superseding Indictment, it would necessarily have proved all the elements of Count

One in the original Indictment. That being the case, I cannot conclude that "each offense contains an element not contained in the other" (*Dixon, supra*, at ——, 113 S.Ct. at 2856) or that each charge "requires proof of a fact which the other does not" (*Blockburger, supra*, at 304, 52 S.Ct. at 182).

The applicability of the Double Jeopardy bar is even clearer if we extend our vision past the formalities of the first Indictment to the affidavits that the government had filed earlier in this case. As detailed in the Findings of Fact, above, the government repeatedly affirmed in sworn submissions to Judge Jensen that it had probable cause to believe that Pius Ailemen and others were involved in a large scale conspiracy to distribute "controlled substances" (emphasis added) that included both heroin (the principal focus of the alleged conspiracy) and cocaine. Those same affidavits contain considerable evidence supporting the inference that there was probable cause to believe that the conspiracy that Ailemen was directing included efforts to traffick in large amounts of cocaine. See paragraphs 9, 11, 13 and 14 of the Findings of Fact, above.

For all these reasons, I find that well before the Complaint was filed in this case (December 20, 1993), and thus well before counsel for the DEA made the decision to proceed with the forfeitures, the government believed that it had probable cause to prosecute Pius Ailemen for a conspiracy to traffick not only in heroin, but also in cocaine. Given that perception of probable cause, I RECOMMEND that the District Court find that the Double Jeopardy Clause bars prosecution of Pius Ailemen on Count One of the Superseding Indictment.

Count Two of the Superseding Indictment charges Pius Ailemen, alone, with engaging in a "continuing criminal enterprise" (CCE) in violation of 21 U.S.C. sec. 848. The original Indictment included no charge under this statute. However, virtually[15] all of the alleged violations of drug laws that were charged as predicates for this continuing criminal enterprise count also were charged in the original Indictment. And had the government proved all the allegations in the first Indictment (read in its entirety), it would have proved every element necessary to establish a violation of 21 U.S.C. sec. 848. See, for a focused list of the elements that the government must prove to establish a "continuing criminal enterprise," *United States v. Garcia*, 988 F.2d 965, 967 (9th Cir. 1993). More specifically, the government would have proved that Pius Ailemen had acted in concert with at least five other persons in committing an interconnected series of felony drug offenses, that, with respect to those persons and offenses, he "occupied a position of organizer, a supervisory position, and other position of management," and that he had derived substantial income from the concerted drug trafficking activities that he directed.[16] The quoted material is from Count Two of the Superseding Indictment, pages 16–17.

It is not at all clear, however, that the same elements test of *Dixon* and *Blockburger* permits a comparison of an Indictment as a whole with a specific count in a later filed charging document. Nor is it clear that the formal "elements" test would permit a comparison of all the sub-allegations that are included in a single conspiracy count with a later filed CCE count. And as a matter of minimum essential elements of proof, it appears that the government could have proved each separate count in the original Indictment without proving everything required to establish a "continuing criminal enterprise"

---

**15.** Of the 36 separate felony violations of drug laws formally charged as predicates for the CCE Count, only one, Count 25, which was one of 32 separate telephone counts, was not charged in the original Indictment.

**16.** For example, in the "MEANS AND METHODS" allegations of Count One of the original Indictment the government alleged that "[i]t was part of the conspiracy that defendant Pius Ailemen would and did organize, supervise, manage, and arrange for the distribution of heroin by

coconspirators," that he "would and did oversee, direct and assume responsibility for obtaining quantities of heroin from other coconspirators," and that four named co-defendants "and others would be and were trusted employees of defendant Pius Ailemen, performing various services for defendant Pius Ailemen, including ... the distribution of heroin, and the receipt of cash derived from the distribution of heroin." (See page 3 of Indictment filed January 3, 1994).

(e.g., that Pius Ailemen directed at least five other persons in the commission of a series of connected felonious drug trafficking crimes from which he derived substantial income). It is difficult to see, however, how it would be possible to prove the allegations formally constituting the CCE count in the Superseding Indictment without thereby also establishing everything necessary to prove the conspiracy to distribute heroin that was charged as Count One of the initial Indictment. In proving the charged elements of Count Two of the Superseding Indictment the government would be required to prove, among other things, that Ailemen and at least five others worked in concert to commit over time a connected series of felony heroin transactions. Thus it appears that the conspiracy count of the first Indictment contains no element that the government would not be required to prove as part of the CCE count of the Superseding Indictment. Cf. *United States v. Reed,* 980 F.2d 1568 (11th Cir.1993). If this analysis is correct, application of the *Dixon* test would seem to require a finding that the CCE count in the second Indictment constituted the "same offense", for Double Jeopardy purposes, as the conspiracy count in the first Indictment. If so, the forfeiture proceedings that the government decided to press (and concluded) between the filing of the first and the second Indictments would be barred by the Double Jeopardy Clause.

If we look, again, beyond the first Indictment to the affidavits that preceded it, we see clearly that the government believed, well before that first Indictment was returned, that it had probable cause to support charging Pius Ailemen with all the elements of a CCE count. See, paragraphs 9, 11, 13 and 14 of the Findings of Fact, above. I therefore RECOMMEND that the District Court dismiss Count Two of the Superseding Indictment on the ground that continuing to prosecute Pius Ailemen under this Count would violate his rights under the Double Jeopardy Clause.

The only remaining count in the Superseding Indictment that sounds against Pius Ailemen is number Forty–One, which charges that between September 7 and September 18, 1993, Pius and Dele Ailemen conspired to launder monetary instruments, in violation of 18 U.S.C. sec. 1956(a)(2)(A). There is no separate count in the first Indictment for conspiracy to launder monetary instruments. And while proof of all the pled sub-allegations of the count in the first indictment that charged conspiracy to distribute heroin would have included proof of all the elements necessary to prove the alleged conspiracy to launder monetary instruments, the government could have proved the distribution conspiracy without proving the money laundering conspiracy. And it appears that the government could establish the elements necessary to prove conspiracy to launder without also establishing the elements necessary to prove conspiracy to distribute (the conspiracy to launder, in theory, could have been independent of the conspiracy to distribute). It follows that if we were to rely only on the formal charging documents, we would not conclude that the same elements test bars prosecution of Pius Ailemen for the alleged conspiracy to launder.

The affidavits that the government filed earlier in the life of this case show, however, that as early as October of 1993, well before the forfeiture proceedings were instituted, the government believed it had probable cause to prosecute Pius (and Dele) Ailemen for the money laundering conspiracy that is charged in Count Forty–One of the Superseding Indictment. The affidavit that Special Agent Robert J. Silano executed and presented to Judge Jensen on October 1, 1993, affirms, at page eight, that the government had already concluded that it had probable cause to believe that Pius Ailemen and others, including Dele Ailemen, "have committed, are committing, and will continue to commit ... laundering of monetary instruments representing the proceeds of unlawful activity. . . ." Then in Note 1 of this Affidavit, at pages 15–16, Agent Silano reports that on September 4, 1993, one of Ailemen's agents disclosed to undercover DEA agents "Ailemen's method of importing heroin, transporting heroin domestically ... and laundering money domestically and internationally." More significantly, the affidavit describes in great detail, between pages 24 and 38, a large number of monitored conversations between Pius and Dele Ailemen

which the government construed as directed toward the goal of laundering proceeds of illegal drug transactions. See especially page 27–29. These conversations, as described and interpreted by the government, show concerted, self-conscious efforts to move money in ways clearly designed to avoid detection. There is no question that the government perceived in these conversations a studied conspiracy to launder money that had been used in and/or gained from illegal drug trafficking. See, e.g., the last sentence on page 28 of this Affidavit, where Agent Silano states: "Your affiant believes that Pius was instructing Dele to send this money to him in a piecemeal fashion to avoid the filing of currency transactions reports." See also the last sentence of the next paragraph, on page 29, where Mr. Silano declares: "Your affiant believes that this money [referring to money discussed by Pius and Dele Ailemen in a monitored conversation on September 9, 1993] had been collected as drug proceeds, which would then be used to purchase more narcotics."

Given my conclusion that the government believed by October 1, 1993, that it had probable cause to prosecute Pius Ailemen on the money laundering conspiracy charge that is reflected in Count Forty–One of the Superseding Indictment, I RECOMMEND, on the ground that further prosecution of Pius Ailemen on this charge would violate his rights under the Double Jeopardy Clause, that the District Court also dismiss that Count, with prejudice, as it sounds against Pius Ailemen.

## SUMMARY OF RECOMMENDATIONS

For the reasons set forth in detail above, I respectfully RECOMMEND that the District Court DISMISS WITH PREJUDICE EVERY COUNT IN THE SUPERSEDING INDICTMENT THAT SOUNDS AGAINST DEFENDANT PIUS AILEMEN.

IT IS SO RECOMMENDED.